**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

CONSOLIDATED INSURANCE COMPANY )
AND INDIANA INSURANCE COMPANY, )
                                         )
            Plaintiffs, )
                                         )    Case No. 17-cv-3985
            v. )
                                         )
NORTH PARK ELEMENTARY SCHOOL )
ASSOCIATION, LYNN LAWRENCE, )
ERIC MOULTON, BEN BOWDON and )
RAMINDER CHADHA, )
                                         )
          Defendants. )

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiffs Consolidated Insurance Company ("Consolidated") and Indiana Insurance Company ("Indiana") (collectively "Insurers") bring this declaratory judgment action against North Park Elementary School Association d/b/a North Park Elementary School ("NPES"), Lynn Lawrence, Eric Moulton and Ben Bowdon (collectively "Defendants") as well as underlying action plaintiff Raminder Chadha pursuant to Rule 57 of the Federal Rules of Civil Procedure and 28 U.S.C. § 2201, seeking a declaration that, with respect to the claims in the underlying action, there is no insurance coverage under certain policies issued by the Insurers.

### INTRODUCTION

1.     NPES is a private educational institution located on the near north side of Chicago. Along with Defendants Moulton and Lawrence, NPES has been sued by an adjoining property owner, Raminder Chadha in the matter captioned, *Raminder Chadha v. North Park Elementary School Assoc., Lynn Lawrence, Eric Moulton, Swan Development, Dan Luna, Ben Bowdon and the City of Chicago*, Circuit Court of Cook County, Law Division, Case No. 13-L-8785 ("Underlying Action").

2.     The Underlying Action alleges that the defendants therein ("Underlying Defendants") engaged in longstanding egregious and fraudulent misrepresentations, defamatory statements, and conspiratorial conduct for the purpose of acquiring Chadha's adjoining property for the use of NPES. Such conduct allegedly resulted in hundreds of thousands (if not millions) of dollars in compensatory and punitive damages to Chadha.

3.     Among other allegations, the Underlying Defendants allegedly made knowingly false complaints to the Alderman's office about health and safety threats posed by the property; rallied parents of NPES students to issue complaints about Chadha's property based on false pretenses; initiated separate suits and complaints with the City of Chicago regarding purported problems with the property; made false offers to purchase the property; intentionally concealed the affiliation to NPES and its board of one proposed buyer; and took actions to contribute to the demolition of the property in the hopes that it could be acquired by NPES.

4.     Consolidated previously agreed to defend under a reservation of rights, but now seeks a declaration of no coverage because information has been developed during discovery in the Underlying Litigation as pled into the Third Amended Complaint which further demonstrates the intentional nature of the conduct. Specifically, the conduct alleged in the remaining counts of the Third Amended Complaint falls outside of the insuring agreement and the conduct is precluded by a number of exclusions and policy provisions. Further, the Underlying Defendants were engaged in the alleged conduct years before notice to Liberty.

5.     The Insurers ask this Court to enter a declaration that they do not a owe a defense or indemnity for the Underlying Action or any other claims arising out of the alleged acts, errors or omissions at issue in the Underlying Action.

## JURISDICTION AND PARTIES

6. Pursuant to 28 U.S.C. § 1391(a)(2), venue is proper in this Court because a substantial part of the events or omissions giving rise to the claims at issue occurred in this district.

7. Consolidated Insurance Company is a company organized under the laws of Indiana and for federal court jurisdiction/diversity of citizenship disclosures purposes, its principal place of business is 175 Berkeley Street, Boston, Massachusetts 02116. It is, therefore, a citizen of Indiana and Massachusetts, as defined by 28 U.S.C. § 1332.

8. Indiana Insurance Company is a company organized under the law of the State of Indiana and for federal court jurisdiction/diversity of citizenship disclosure purposes, its principal place of business is 175 Berkeley Street, Boston, Massachusetts. It is, therefore, a citizen of Indiana and Massachusetts, as defined by 28 U.S.C. § 1332.

9. Upon information and belief, NPES is a private, tuition-based elementary school, located at 2017 West Montrose Avenue, Chicago, Illinois. It is, therefore, a citizen of Illinois, as defined by 28 U.S.C. § 1332.

10. Upon information and belief, Lynn Lawrence was, at all relevant times, the principal of NPES and resides in Cook County, Illinois.

11. Upon information and belief, Eric Moulton was, at all relevant times, a member of the Board of NPES, as well as the president of Swan Development Corporation ("Swan Development"), and resides in Cook County, Illinois.

12. Upon information and belief, Ben Bowdon was, at all relevant times, the business manager of NPES and resides in Cook County, Illinois.

13.     Upon information and belief, Raminder Chadha resides in Cook County, Illinois, with his principal residence at 2035 W. Montrose Avenue, Chicago, Illinois.

14.     The Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1332(a)(1) because the Insurers and the Defendants are citizens of different states, and the amount in controversy exceeds $75,000.00, excluding interest and costs.

15.     The Court also has jurisdiction over this declaratory judgment action pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201. An actual and substantial controversy exists between the plaintiffs and defendants regarding a series of issues, including (but not limited to) whether NPES can pursue a claim against the Insurers pursuant to the insurance policies at issue.

## UNDERLYING ACTION

16.     Chadha filed the Underlying Action on August 2, 2013. The complaint therein was amended a number of times and a Third Amended Complaint was filed on June 15, 2015 ("Underlying Action" or "Complaint," attached as **Exhibit 1** and incorporated herein by reference).

## NPES'S CONDUCT IN FURTHERANCE OF SECURING THE PROPERTY

17.     The Complaint alleges that Chadha, a licensed realtor, purchased the property located at 2035 W. Montrose, Chicago, Illinois 60618 ("Property") in July 2008, for $225,000, though it appraised for $340,000. At the time of purchase, the property had been damaged by fire and Chadha intended to rehab and live on the Property. (Exh.1, p.2).

18.     The Complaint further alleges that because of the 2008-2009 real estate crash and financing issues, Chadha began offering the Property for sale. (Exh. 1, p.2).

19.     In the summer of 2009, Chadha allegedly approached NPES principal Lawrence to determine if he was interested in purchasing the property. Lawrence allegedly already

considered whether NPES could acquire the Property unbeknownst to Chadha, but Lawrence advised that NPES was not interested. (Exh. 1, p.3).

20.     However, NPES, through Lawrence and NPES Board Member Eric Moulton, along with staff members of Alderman Eugene Schulter's office, allegedly engaged in concerted efforts and schemes to force Chadha to sell the Property at a below market price. (Exh. 1, p.3).

31.     In March 2010, Moulton allegedly approached Chadha about purchasing the property as a real estate developer on behalf of an unidentified client, which was actually NPES, which was never disclosed. (Exh. 1, p.4).

32.     Similarly, Lawrence allegedly "never once disclosed to Chadha that [Moulton] was her or NPES's affiliate, or that she and Eric and employees of the city of Chicago were working in concert, or that in the event that [Moulton] was able to obtain the 2035 Property, that he would sell to NPES at a likely inflated price." (Exh. 1, p.5).

33.     Moulton allegedly made multiple unsolicited offers to Chadha for the Property, who refused on the basis that they were unreasonably low. (Exh. 1, p.5).

### NPES'S ADVANCEMENT OF A PENDING HOUSING COURT ACTION

34.     NPES also allegedly caused the advancement of the litigation captioned as *City of Chicago v. 2035 W. Montrose Avenue, Chadha Raminder, Harris Bank, N.A., Non-Record Claimants, and Unknown Owners*, Case No. 2010-M1 401074, Circuit Court of Cook County, Municipal Division, and filed on April 30, 2010 ("Housing Court Action"). The Housing Court Action related to the Property's alleged building code violations.

35.     NPES's alleged goal was to commence a series of "neighborhood nuisance" complaints and actions against the Property to obtain the Property. (Exh. 1, p.7-8).

36.     Those actions included (1) filing of multiple complaints against the Property filed by the City of Chicago; (2) Alderman Schulter's refusal to submit or provide Chadha with

necessary documents so he could secure permits to rehab the Property; (3) a separate lawsuit against Chadha regarding lead exposure; (4) a court order requiring demolition of the Property and its subsequent demolition in December 2010; and (5) the filing of a lis pendens against Chadha's title to the Property, which had the effect of annihilating his ability to secure financing to perform renovations to the Property. (Exh. 1, p.6-7).

37.     Chadha was allegedly issued violations as the "direct result of specific, concerted efforts" by Lawrence, Moulton, and the staff at NPES, among others. (Exh. 1, p.7-8).

38.     These efforts were "harassment and intentional acts toward Chadha" and that the purposes of the complaints were to force Chadha "into a bad financial position" so that he "would more readily accept the NPES efforts to purchase the 2035 Property." (Exh. 1, p.8-9).

**THE PROPERTY'S DEMOLITION AND NPES'S ACTION FOR INJUNCTIVE RELIEF**

39.     In October 2010, Chadha received a notice from the City of Chicago requiring demolition, despite the fact that the matter in housing court was pending. (Exh. 1, p.17).

40.     In December 6, 2010, Lawrence allegedly asked all parents of NPES students to attend a hearing on December 7, 2010 in the Housing Court Action, encouraging parents to show that the Property was a safety hazard for children and the community. (Exh. 1, p.18).

41.     The Underlying Action alleges that, pursuant to an order in the Housing Court Action, Chadha had the Property demolished on December 21, 2010, "believing he had no choice or any legal remedy or defense."  (Exh. 1, p.18).

42.     Ben Bowdon, NPES's business manager, allegedly issued communications to parents of NPES students in January 2011 stating that Chadha had caused a health and safety hazard that led to soil weakening, which could contribute to the collapse of a fence on NPES premises and that could create the risk of serious injury. Additionally, the communications stated that Chadha had added lead to the soil of NPES property.

6

43.     On January 9, 2011, NPES sued Chadha for injunctive relief in an action captioned *North Park Elementary School v. Raminder S. Chadha, Circuit Court of Cook County*, No. 2011-CH-02195 ("NPES Action," attached hereto as Exhibit 2). (Exh. 1, p.20).

44.     On January 19, 2011, NPES also filed an Emergency Motion and Memorandum for Temporary Restraining Order ("TRO") and Preliminary Injunction (attached as Exhibit 3).

45.     This TRO was allegedly a "tool…utilized to attempt to encumber the Property, force Chadha's hand, lower the property value and induce Chadha to sell and to punish him for not acquiescing..." (Exh. 1, p.21).

46.     NPES, the NPES Board, Lawrence, Moulton and others also allegedly "utilized political and pressure tactics to… lower the market value of the 2035 Property so that Chadha would see little choice but to sell his property to NPES, and …to ruin his reputation as a realtor in order to convince him to sell the 2035 Property to NPES." (Exh. 1, p.21).

47.     In furtherance of these efforts, NPES's Business Manager Bowdon wrote to Andrew Spalding, apparently an employee of the City of Chicago, expressing that: (1) NPES had "grave concerns about whether what we're watching being built is actually safe and compliant with building code"; (2) "Alderman Schulter and his staff have been great friends and advocates, but they are limited in what they can do for us"; and (3) inviting Spalding to "stop by and take a look at the project next door." (Exh. 1, p.22).

48.     The NPES Action was dismissed subject to a non-suit on November 17, 2011. The Underlying Action alleges that it was dismissed once "it was clear that Chadha would not sell to NPES." (Exh. 1, p.23).

### THE INTENTIONAL NATURE OF THE COMPLAINT'S ALLEGATIONS

49.     The operative counts in the Third Amended Complaint all include counts alleging strictly intentional allegations:  Civil Conspiracy (Count I), Tortious Inference (Count III); and Aiding and Abetting (Count V). (Exh. 1).

50.     NPES, Lawrence and Moulton allegedly (1) acted "in furtherance of their conspiratorial and fraudulent scheme," "committed fraud and through their tactics tricked the former owner of 2033 W. Montrose to sell that property." (Exh. 1, p.23-24); (2) "defamed Chadha and used fraudulent misrepresentations" to rally the Alderman's Office and "acted in furtherance of a conspiracy in that they communicated and banded together for the purpose of accomplishing by concerted action, the harassment and slander and intimidation of Chadha as well as by making and asking others to make the false complaints." (Exh. 1, p.25); (3) knowingly and "intentionally interfered" with Chadha's expectancy of rehabbing the Property by "taking steps and seeking out aldermanic and political assistance" and "putting pressure" on Chadha. (Exh. 3, p.28); and (4) encouraged wrongful and unsustainable claims against Chadha, in the Circuit Court of Cook County, made and encouraged false building code complaints, performed wrongful acts of conspiracy to defraud, defamation, and tortious interference" and "knowingly and intentionally performed wrongful acts which damaged Chadha." (Exh. 1, p.30);

51.     NPES also allegedly (1) "wrongfully and without just cause, claimed [Chadha] poisoned children or had connection to lead exposure…when that was not true, which had the effect of putting a cloud on Chadha's title, and frustrated his ability to finance the work on his property – all for the purpose of trying to force Chadha to acquiesce and to sell to NPES at a substantially reduced price" (Exh. 1, p.32); (2) "NPES (through its Board) was at all times fully and meaningfully aware of all of Lynn [Lawrence's] tactics and the involvement and improper persuasion of the city of Chicago" (Exh. 1, p.32); and (3) all Defendants were aware of their

roles in helping NPES and Lawrence to obtain the Property "through any means possible" and "knowingly and substantially assisted in the principal violations…" (Exh. 1, p.32-33).

52.     The Complaint alleges that Chadha has "suffered prejudice in the neighborhood," and seeks damages exceed $300,000, can be proven up at trial, and seeks punitive damages in an amount exceeding $500,000. (Exh. 1, p.28-29).

## CHADHA'S DEMAND AND NPES'S TENDER

53.     In a letter dated June 7, 2012 Chadha sent NPES a written demand, ("June 7, 2012 Demand," attached as Exhibit 4) alleging that NPES engaged in malicious prosecution, harassment, defamation, deceit, fraudulent misrepresentation, and other associated wrongdoing in connection with the Property.

54.     The June 7, 2012 Demand sought payment of $225,000 within 15 days and threatened suit. (Exh. 4).

55.     On or around August 27, 2012, NPES provided notice to Consolidated of the June 7, 2012 Demand (attached as Exhibit 5).

56.     On September 14, 2012, Consolidated requested any and all materials from Chadha in support of the claim. (Exhibit 6).

57.     On September 24, 2012, Consolidated acknowledged receipt of the notice to NPES and fully reserved rights. (September 24, 2012 Reservation of Rights, attached as Exhibit 7).

58.     Consolidated repeatedly attempted to follow up with Chadha and his counsel in 2012 and 2013 and Chadha provided communications between him and Moulton in the March to August 2010 timeframe (Feb. 19, 2013 Letter and Feb. 26, 2013 Email, attached as Exhibits 8 (p.18) and 9 (p.19-24) respectively).

59.     On August 2, 2013, Chadha filed the Underlying Action.

60.     In a letter dated September 16, 2013, Consolidated acknowledged receipt of the Summons and Complaint in the Underlying Action and agreed to defend under the terms and conditions of a Consolidated policy. (attached as Exhibit 10).

61.     On September 11, 2014, Consolidated issued another letter advising that it would continue providing a defense to NPES, Lawrence, Bowdon, and Moulton subject to a reservation of rights (attached as Exhibit 11).

62.     On June 27, 2016, Consolidated issued supplemental reservation of rights to NPES, Bowdon, Lawrence and Moulton (attached as Group Exhibit 12).

63.     Consolidated maintains that there is no coverage for the Underlying Action.

## THE POLICIES

64.     Consolidated issued commercial Package Policy CBP8498883 to NPES in successive periods from September 1, 2010 to September 1, 2014 ("Package Policies," attached as Exhibits 13-16). The Package Policies included a number of coverage parts, including a Commercial General Liability ("CGL") Coverage Part and a School Leaders Errors and Omissions Liability ("E&O") Coverage Part.

65.     Indiana issued Umbrella Policy no. CU8499883 to NPES ("Umbrella Policy," attached as Exhibit 17-20), also effect in successive periods from September 1, 2010 to September 1, 2014.

66.     The Package Policies and Umbrella Policies are referred to herein collective as "Policies" where appropriate.[1]

---

[1] References herein to the Package Policy and Umbrella Policy refer to those policies effective September 1, 2011 to September 11, 2012 (Exh. 14 and 18)

67.    The Package Policy's E&O Coverage Part has a $1,000,000 limit of liability for each Wrongful Act as defined in the Consolidated Policy and in the Aggregate. The E&O Coverage Part carries a $2,500 deductible for one Wrongful Act.

68.    The Package Policy's CGL coverage part has a $1,000,000 limit of liability per occurrence and $3,000,000 in the aggregate.

69.    The Umbrella Policy has a $2,000,000 limit of liability per occurrence and in the aggregate, in excess of a $10,000 self-insured retention.

70.    The E&O and CGL Coverage Parts of the Package Policy are scheduled into the Umbrella Policy and unless otherwise designated, the Umbrella Policy is subject to the terms, conditions, and limits of the Package Policy.

**A.    PACKAGE POLICY**

71.    The insuring agreements of the Package Policy provide in relevant part:

School Leaders Errors and Omissions Liability Coverage Form
…

SECTION I - COVERAGE

A.    **Insuring Agreement**

1. We will pay those sums that the insured becomes legally obligated to pay because of "loss" arising from a "wrongful act" to which this insurance applies.

2. The amount we will pay for "loss" under paragraph 1. above is limited as described in **SECTION III-LIMIT OF INSURANCE AND DEDUCTIBLE**.

3. No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under **Section I.B. Defense and Defense Expense.**

4. This insurance applies only to "wrongful acts" that are committed:

a. Anywhere in the world if the insured's responsibility to pay "loss" is determined in a "suit" brought on the merits in the United States of America (including its territories or possessions), Puerto Rico or Canada, or in a settlement we agree to; and

b. During the "policy period" if a "claim" is first made against any insured during the "policy period" or any Discovery Period (provided in accordance with **SECTION V – DISCOVERY PERIODS**); or

c. Prior to the "policy period" and on or after the "retroactive date", if any, but only if:

(1) On or before the effective date of the first School Leaders Errors and Omissions Liability Coverage Part issued by us and continuously renewed and maintained by the insured:

(a) The insured did not give notice to any prior insurer of such "wrongful act"; and

(b) The insured had no knowledge of such "wrongful act" likely to give rise to a "claim" hereunder; and

(2) A "claim" is first made against any insured during the "policy period" or any Discovery Period (provided in accordance with SECTION V – DISCOVERY PERIODS).

5.      A "claim" by a person or organization will be deemed to have been made when notice of such "claim" is received and recorded by any insured or by us, whichever comes first.

If during the "policy period" or a Discovery Period (provided in accordance with **SECTION V – DISCOVERY PERIODS**) an insured becomes aware of a "wrongful act" that could reasonably be expected to give rise to a "claim" and gives written notice to us as soon as practicable in accordance with paragraph **1.** under Section **IV.B. Duties in the Event of a Wrongful Act, Claim or Suit,** then any "claim" subsequently arising from such "wrongful act" shall be considered to have been made during the "policy period" or the Discovery Period in which the "wrongful act" was first reported in writing to us.

All "claims" because of a single "wrongful act" or a series of casually connected "wrongful acts" will be deemed to have been made at the time the first of these "claims" is made against any insured.

B.      Defense and Defense Expenses

1. We will have the right and duty to defend the insured against any "suit" seeking:

a. "Loss" because of a "wrongful act" to which this insurance applies.  But:

(1) When the Each Wrongful Act Limit or Aggregate Limit has been used up in the payment of "loss", our duty to defend ends with respect to any "suit" seeking "loss" subject to such exhausted limit; and

(2) We will have no duty to defend the insured against any "suit" seeking "loss" to which this insurance does not apply.

\*          \*          \*

3. We may settle any "claim" that may result from a "wrongful act", provided we have your consent.  However, our liability will be limited as described below if you refuse to consent to any settlement that we recommend and elect to contest the "claim" or continue any legal proceedings in connection with such "claim" at your own cost and without our involvement:

a. If the "claim" is seeking "loss":

(1) Our obligation to pay "loss" under this policy shall be the lesser of the following:

(a) The amount in excess of the Deductible, if any, we would have paid for "loss" if you had consented at the time of our recommendation; or

(b) The limit of insurance; and

(2) Our obligation to pay under provision **4.a.** below shall be limited to the costs and expenses incurred with our consent up to the date of such refusal.

\*          \*          \*

72.     The Package Policy's School Leaders Errors and Omissions Liability Endorsement ("E&O Endorsement") contains the following exclusions:

**C. Exclusions**

This insurance does not apply to:

**1. Personal Injury Offenses**

Any "claim" arising out of:

\*          \*          \*

c.     The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor;

d.     Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or

e.     Oral or written publication of material that violates a person's right of privacy.

\*          \*          \*

**2. Bodily Injury or Property Damage**

Any "claim" arising out of:

a. "Bodily injury"; or

b. Physical injury to tangible property, including all resulting loss of use of that property.

\*          \*          \*

**5.     Criminal, Fraudulent, Malicious or Dishonest Acts**

Any insured who commits, participates in or consents to a "wrongful act" that is criminal, fraudulent, malicious or deliberately dishonest.

\*          \*          \*

**8.     Illegal Profit or Advantage**

Any insured who commits a "wrongful act" that gains or causes another to gain personal profit or advantage to which the insured or other person was not legally entitled [modified by Amendatory Endorsement for School Leaders Errors and Omissions Liability Coverage Part, B.2].

\*          \*          \*

73.     The Package Policy's E&O Endorsement provides as to an "insured" thereunder:

**SECTION II-WHO IS AN INSURED**

Each of the following is an insured:

A. The "educational institution", and its board of governors, board of education, school committee, board of trustees, or commission.

B. Each of the following is also an insured for acts within the scope of their duties as such:

1. Any person who was, now is, or shall be an elected or appointed member of your board of governors, board of education, school committee, board of trustees or commission [modified by Amendatory Endorsement for School Leaders Errors and Omissions Liability Coverage Part, C].;

2. Your "employees"…

74.     The Package Policy's E&O Endorsement contains the following conditions:

**SECTION IV-SCHOOL LEADERS ERRORS AND OMISSIONS LIABILITY CONDITIONS**

\*     \*     \*

**B. Duties In The Event of a Wrongful Act, Claim or Suit**

a. You must see to it that we are notified as soon as practicable of any "wrongful act" which may result in a "claim". To the extent possible, notice should include:

a. How, when and where the "wrongful act" was committed;

b. The names and addresses of any person who may sustain damages and witnesses; and

c. The nature of harm resulting from the "wrongful act."

2. If a "claim" is received by any insured, you must:

a.  Immediately record the specifics of the claim and the date received; and

b. Notify us promptly.

You must see to it that we receive written notice of the "claim" as soon as practicable.

3. You and any other involved insured must:

a. Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit'"

b. Authorize us to obtain records and other information;

c. Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

d. Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

4. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

\*       \*       \*

75.     The Package Policy's E&O Endorsement contains the following definitions:

**SECTION VI - DEFINITIONS**

A. "Bodily injury" means physical injury, sickness or disease sustained by a person. This includes mental anguish, mental injury, shock, fright or death that results from such physical injury, sickness or disease.

B. "Claim" means:

1. A written demand for monetary damages, or injunctive or other non-monetary relief; or

2. A "suit"

C. "Defense expenses" means reasonable costs, charges and fees (including but not limited to attorney's fees and experts' fees) and expenses allocated to a specific "claim" for its investigation, settlement or defense, and the premium for appeal, attachment, or similar bonds. "Defense expenses" does not include:

1. Wages, salaries, expenses or fees of your trustee, committee members, volunteers, directors, officers, or "employees";

2. Wages, salaries and expenses of our employees; or

3. Fees and expenses of independent adjusters we hire.

\*       \*       \*

E.     "Employee' includes a "leased worker" or a substitute teacher. "Employee" does not include a "temporary worker".

16

\*  \*  \*

H. "Loss" means monetary damages, judgments or settlements. "Loss" does not include:

\*  \*  \*

 2. Costs of compliance with any injunctive or other non-monetary relief action.

\*  \*  \*

4. "Legal fees" when solely injunctive or other non-monetary relief action.

5. Punitive or exemplary damages.

6. The multiplied portion of multiple damages.

7. Fines or penalties imposed by law.

8. Matters deemed uninsurable according to the law under which this policy is construed [modified by Illinois Changes Endorsement, D, p.2).

\*  \*  \*

J. "Retroactive date" means the Retroactive Date shown in the Declarations for this Coverage Part [November 28, 2005, as indicated in the Declarations[.

\*  \*  \*

N. "Wrongful act" means any actual or alleged act, breach of duty, neglect, error, omission, misstatement, or misleading statement committed by the insured, or by any person for whose acts the insured is legally liable, while in the course of performing "educational institution" duties.

76. The Package Policy's E&O Endorsement provides as to defense expenses:

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**ILLINOIS CHANGES – DEFENSE EXPENSES**

\*  \*  \*

D.    If your policy contains SCHOOL LEADERS ERRORS AND OMISSIONS LIABILITY COVERAGE PART:

1. The following is added to provision **4.a.** of paragraph **B.    Defense And Defense Expenses** under **SECTION I – COVERAGE:**

**Defense Expense Reimbursement**

If we initially defend an insured or pay for an insured's defense but later determine that the "claim(s)" is (are) not covered under this insurance, we will have the right to reimbursement for the defense expenses we have incurred.

The right to reimbursement for the defense expenses under this provision will only apply to defense expenses we have incurred after we notify you in writing that there may not be coverage, and that we are reserving our rights to terminate the defense and seek reimbursement for defense expenses.

2. The following is added to provision **4.b.** of paragraph **B.    Defense And Defense Expense** under **SECTION I – COVERAGE:**

**"Defense Expense" Reimbursement**

If we initially defend an insured or pay for an insured's defense but later determine that the "claim(s)" is (are) not covered under this insurance, we will have the right to reimbursement for the "defense expenses" we have incurred.

The right to reimbursement for the "defense expenses" under this provision will only apply to "defense expenses" we have incurred after we notify you in writing that there may not be coverage, and that we are reserving our rights to terminate the defense and seek reimbursement for "defense expenses".

77.    The Package Policy's CGL Coverage Part provides under Coverage A:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

*      *      *

SECTION I – COVERAGES

COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

**1.    Insuring Agreement**

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" or "personal and

advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" or "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

(1) The amount we will pay for damages is limited as described in Section **III**-Limits of Insurance; and

(2) Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C.**

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments-Coverages **A** and **B**.

b. This insurance applies To "bodily injury" and "property damage" only if:

(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory;" and

(2) The "bodily injury" or "property damage" occurs during the policy period.

(3) Prior to the policy period, no insured listed under Paragraph **1**. of Section **II**-Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

c. "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph 1. of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

d. "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph 1. of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

(1) Reports all, or any part of the "bodily injury" or "property damage" to us or any other insurer;

(2) Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

(3) Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

78.     Coverage A of the CGL Coverage Part in the Package Policy also contains the following Exclusions:

**2. Exclusions**

This insurance does not apply to:

**a. Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

    *        *        *

**o. Personal And Advertising Injury**

    "Bodily Injury" arising out of "personal and advertising injury."

79.     The Package Policy's CGL Coverage Part provides under Coverage B:

**COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY**

**1. Insuring Agreement**

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

(1) The amount we will pay for damages is limited as described in Section **III** – Limits Of Insurance; and

(2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C.**

80.     Coverage B of the CGL Coverage Part in the Package Policy also contains the following Exclusions:

**2. Exclusions**

This insurance does not apply to:

**a. Knowing Violation Of Rights Of Another**

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

**b. Material Published With Knowledge Of Falsity**

"Personal and advertising injury" arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity. Criminal Acts

**c. Material Published With Knowledge of Falsity**

"Personal and advertising injury" arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity.

**d. Criminal Acts**

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

81.     The CGL Coverage Part of the Package Policy provides as to who is an insured:

**SECTION II – WHO IS AN INSURED**

1.      If you are designated in the Declarations as:

a.      An individual, you and your spouse are insureds but only with respect to the conduct of a business of which you are the sole owner.

b.      A partnership or joint venture, you are an insured.  Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

c.      A limited liability company, you are an insured.  Your members are also insureds, but only with respect to the conduct of your business.  Your managers are insureds, but only with respect to their duties as your managers.

d.      An organization other than a partnership, joint venture or limited liability company, you are an insured.  Your "executive officers' and directors are insureds, but only with respect to their duties as your officers or directors.  Your stockholders are also insureds, but only with respect to their liability as stockholders.

e.      A trust, you are an insured.  Your trustees are also insureds, but only with respect to their duties as trustees.

2.      Each of the following is also an insured:

Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business.  However, none of these "employees" or "volunteer workers" are insureds for:

*       *       *

(2)     "Property damage" to property:
(a)     Owned, occupied or used by,
(b)     Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by
You, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

82.     The CGL Coverage Part of the Package Policy contains the following conditions:

**SECTION IV- COMMERCIAL GENERAL LIABILITY CONDITIONS**

**2. Duties In The Event of Occurrence, Offense, Claim or Suit**

a. You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

22

(1) How, when and where the "occurrence" or offense took place;

(2) The names and addresses of any injured persons and witnesses; and

(3) The nature and location of any injury or damage arising out of the "occurrence" or offense.

b. If a claim is made or "suit" is brought against any insured, you must:

(1) Immediately record the specifics of the claim or "suit" and the date received; and

(2) Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

c. You and any other involved insured must:

(1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit"'

(2) Authorize us to obtain records and other information;
(3) Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

(4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

d. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

\*       \*       \*

83.     The CGL Coverage Part of the Package Policy contains the following definitions:

**SECTION V – DEFINTIONS**

**3**.     "Bodily injury" means bodily injury, sickness or diseases sustained by a person, including death resulting from any of these at any time.

\*       \*       \*

**5.**     "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

**6.**     "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

\*        \*        \*

**13.**     "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

**14.**     "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

\*\*\*

**b.**     Malicious prosecution;

**c.**     The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

**d.**     Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

**e.**     Oral or written publication, in any manner, of material that violates a person's right of privacy;

**17.**     "Property damage" means:

a.     Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b.     Loss of use of tangible property that is not physical injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

**20.**     "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed by you.

### B. UMBRELLA POLICY

84. The insuring agreements of the Umbrella Policy provide in relevant part, including in its School Leaders Errors and Omissions Liability – Follow Form Endorsement ("E&O Follow Form Endorsement"):

> **School Leaders Errors and Omissions Liability – Follow Form**
> …
>
> When School Leaders Errors and Omissions Liability is shown in the Schedule of Underlying Insurance and for the purposes of this coverage only:
>
> A. The following are added to paragraph **1. Insuring Agreement under SECTION I – Coverage:**
>
> 1. We will pay those sums that the insured becomes legally obligated to pay because of "loss" arising from a "wrongful act" to which this insurance applies.
>
> No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under **2. Defense and Expense of Claims and Suits.**
>
> 2. This insurance applies only to "loss" described in paragraph 1. Above to the extent of coverage afforded by valid "scheduled underlying insurance" that is applicable to such "loss" or would have been applicable but for the exhaustion of the limits of the "scheduled underlying insurance". The coverage provided:
>
> a. Will follow the provisions, exclusions and limitations of the "scheduled underlying insurance" unless otherwise directed by this insurance;…
>
> *       *       *
>
> **E. SECTION IV – CONDITIONS applies except as amended below:**
>
> **1.** The title and provision a. of condition 3. are replaced by the following:
>
> Duties in the Event Of Occurrence, Offense, Wrongful Act, Claim or Suit
>
> a. You must see to it that we are notified as soon as practicable of an "occurrence", "wrongful act" or "offense" which may result in a "claim" under this Coverage Part. Notice should include:
>
> (1) How, when and where the "occurrence", "wrongful act" or "offense" took place;

(2) The "insured's" name and address;

(3) The names and addresses of any person who may sustain injury or damage and witnesses; and

(4) The nature and location of any injury or damage arising out of the "occurrence", "wrongful act" or "offense."

85.     The Umbrella Policy's  Commercial Umbrella Liability ("UL") Coverage Form

provides in relevant part:

COMMERCIAL UMBRELLA LIABILITY COVERAGE FORM

\*       \*       \*

SECTION I – COVERAGE

**1.      Insuring Agreement**

a. We will pay on behalf of the insured those sums in excess of the "Retained limit" that the insured becomes legally obligated to pay as damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies. The amount we will pay is limited as described in **SECTION III – LIMITS OF INSURANCE**. No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under paragraph **2. Defense And Expense of Claims and Suits** under **SECTION I – COVERAGE.**

b. This insurance applies to:

(1) "Bodily injury" or "property damage" only if:

(a) The "bodily injury" or "property damage" occurs during the Policy Period.

(b) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

(c) Prior to the Policy Period, no insured listed under Paragraph **1**. of Section **II-Who Is An Insured** and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part.  If such listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the Policy Period.

(2) "Personal and advertising injury" caused by an "offense" arising out of your business but only if the "offense" was committed in the "coverage territory" during the Policy Period.

c. "Bodily injury" or "property damage" which occurs during the Policy Period and was not, prior to the Policy Period, known to have occurred by any insured listed under paragraph 1. of SECTION II – WHO IS AN INSURED of any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the Policy Period.

d. "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under paragraph 1. Of SECTION II – WHO IS AN INSURED or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

(1) Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

(2) Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

(3) Becomes aware of any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

\*      \*      \*

2. Defense And Expense of Claims and Suits

a. Defense, Investigation And Settlement

(1) We shall have the right and duty to defend the insured against any claim or "suit" seeking damages to which this insurance applies when:

(a) Such damages are not covered by "scheduled underlying insurance" or "other underlying insurance"; or

(b) The applicable limits of liability of the "scheduled underlying insurance" or "other underlying insurance" have been exhausted by payment of judgments or settlements.

However, we will have no duty to defend the insured against any "suit" seeking damages to which this insurance does not apply.

(2) When insurance is available to the insured under any "scheduled underlying insurance" or "other underlying insurance", we will have the right and

opportunity, although not the obligation, to associate with the "underlying insurers" in the defense and control of any claim or "suit" which, in our opinion, may create liability under this Coverage Part.

(3) At our discretion, we may:

(a) Investigate any "occurrence", "offense" or claim; and

(b) Settle any claim or "suit" of which we assume charge of the settlement or defense.

(4) We will not be required to defend the insured against any existing or future claim or "suit" after the applicable Limit of Insurance shown in the Declarations has been exhausted by payment of judgments or settlements.

86.     The Commercial Umbrella Liability ("UL") Coverage Part in the Umbrella Policy

contains the following Exclusions:

**3. Exclusions**

This insurance does not apply to:

**a. Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured.

\*       \*       \*

**s. Personal And Advertising Injury**

"Personal and advertising injury":

(1) Caused by or at the direction of the insured with knowledge that the act would violate the rights of another and would inflict "personal and advertising injury";

(2) Arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity;

(3) Arising out of oral or written publication of material whose first publication took place before the beginning of the Policy Period;

(4) Arising out of a criminal act committed by or at the direction of any insured;

\*       \*       \*

28

87.     The UL Coverage Part of the Umbrella Policy provides as to who is an insured:

**SECTION II – WHO IS AN INSURED**

1. Except for liability arising out of the "auto hazard":

a.      If you are designated in the Declarations as:

(1)     An individual, you and your spouse are insureds but only with respect to the conduct of a business of which you are the sole owner.

(2)     A partnership or joint venture, you are an insured.  Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

(3)     A limited liability company, you are an insured.  Your members are also insureds, but only with respect to the conduct of your business.  Your managers are insureds, but only with respect to their duties as your managers.

(4)     An organization other than a partnership, joint venture or limited liability company, you are an insured.  Your "executive officers' and directors are insureds, but only with respect to their duties as your officers or directors.  Your stockholders are also insureds, but only with respect to their liability as stockholders.

(5)     A trust, you are an insured.  Your trustees are also insureds, but only with respect to their duties as trustees.

b.      Each of the following is also an insured:

*       *       *

(5) Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business.  However, none of these "employees" or "volunteer workers" are insureds for:

*       *       *

(2)     "Property damage" to property:
(i)     Owned, occupied or used by,
(ii)    Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by

29

You, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

88.     The UL Coverage Part of the Umbrella Policy contains the following conditions:

### 3. Duties In The Event of Occurrence, Offense, Claim or Suit

a. You must see to it that we are notified as soon as practicable of an "occurrence" or "offense" which may result in a claim under this Coverage Part. Notice should include:

(1) How, when and where the "occurrence" or offense took place;

(2) The insured's name and address;

(3) The names and addresses of any injured person(s) and witnesses; and

(4) The nature and location of any injury or damage arising out of the "occurrence" or "offense".

b. If a claim is made or "suit" is brought against any insured which may result in a claim against this insurance, you must:

(1) Immediately record the specifics of the claim or "suit" and the date received; and

(2) Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

c. You and any other involved insured must:

(1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit'"

(2) Authorize us to obtain records and other information;

(3) Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

(4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

d. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

\*       \*       \*

**7. Representations**

By accepting this policy, you agree that:

a. The information shown in the Declarations is accurate and complete;

b. The information is based upon representations you made to us;

c. We evaluated the risk to be covered by this insurance, and then issued this policy, in reliance upon your representations; and

d. Except as otherwise provided in this policy or by law, this policy is void in any case of fraud by you or if you intentionally conceal or misrepresent any material facts concerning this policy or any claim under this policy.

89.    The UL Coverage Part of the Umbrella Policy contains the following definitions:

**SECTION V – DEFINTIONS**

**3**.    "Bodily injury" means bodily injury, sickness or diseases sustained by a person. This includes mental anguish, mental injury, shock, fright or death that results from such physical injury, sickness or disease. This does not include "consequential bodily injury."

**5.** "Consequential bodily injury" means "bodily injury" arising out of "personal and advertising injury."

\*       \*       \*

**7.** "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

**8.** "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

\*       \*       \*

**14.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions", that results in "bodily injury" or "property damage"; or

**15**.     "Offense" means an offense included in the definition of "personal and advertising injury". All damages that arise from exposure to the same act, publication or infringement are considered one "offense."

**17**.     "Personal and advertising injury" means injury, other than "bodily injury", arising out of one or more of the following offenses:

\*          \*          \*

**b.**        Malicious prosecution;

**c.**        The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

**d.**        Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

**e.**        Oral or written publication, in any manner, of material that violates a person's right of privacy;

**21**        "Property damage" means:

a.        Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b.        Loss of use of tangible property that is not physical injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

90.        The Illinois Changes – School Amendatory Endorsement modifies the UL

Coverage Part of the Umbrella Policy as follows:

COMMERCIAL UMBRELLA LIABILITY COVERAGE PART

**I. Personal and Advertising Injury – Follow Form**

A. The following is added to provision (2) of paragraph **1. Insuring Agreement** under **SECTION I – COVERAGE**:

This insurance applies to "personal and advertising injury" to the extent of coverage afforded by valid "scheduled underlying insurance" that is applicable to such "personal and advertising injury" or would have been applicable to such injury but for the exhaustion of the limits of the "scheduled underlying insurance". The coverage provided:

(a) Will follow the provisions, exclusions and limitations of the "scheduled underlying insurance" unless otherwise directed by this insurance; and

(b) Will be subject to Condition 13. **Maintenance of Scheduled Underlying Insurance.**

\*      \*      \*

C. Definition **17.** Under **SECTION V – DEFINITIONS** is superseded by the definition of "personal and advertising injury" contained in the "scheduled underlying insurance."

\*      \*      \*

SECTION IV – CONDITIONS is amended as follows:

1. The following is added to paragraph 3. Duties in The Event of Occurrence, Offense, Claim or Suit:

Knowledge of an "occurrence", "offense" claim or "suit by an agent, servant or "employee" of any insured shall not in itself constitute knowledge of the insured unless the school superintendent, business manager or a person designated by them to receive reports of "occurrences", offenses, claims and "suits' shall have received such notice from the agent, servant or employee."

2. Provision d. of Condition 7. Representations is replaced by the following:

d. Your failure to disclose all hazards of prior "occurrences' or "offenses" existing as of the inception date of the policy shall not prejudice the coverage afforded by this policy provided such failure to disclose all hazards or prior "occurrences" or "offenses" is not intentional.

91.      The Package and Umbrella Policies contain other endorsements that modify select provisions, exclusions and definitions therein.

## COUNT I

92.      The Insurers re-allege paragraphs 1 through 91.

93.      The Underlying Action alleges that Defendants "defamed Chadha and used fraudulent misrepresentations" to rally the Alderman's Office and "acted in furtherance of a conspiracy in that they communicated and banded together for the purpose of accomplishing by

concerted action, the harassment and slander and intimidation of Chadha as well as by making and asking others to make the false complaints." (Exh. 1, p.25).

94. The Underlying Action alleges that Defendants encouraged wrongful and unsustainable claims against Chadha, in the Circuit Court of Cook County, made and encouraged false building code complaints, performed wrongful acts of conspiracy to defraud, defamation, and tortious interference" and "knowingly and intentionally performed wrongful acts which damaged Chadha." (Exh. 1, pp.30).

95. The Underlying Action alleges that NPES "wrongfully and without just cause, claimed he poisoned children or had connection to lead exposure…when that was not true, which had the effect of putting a cloud on Chadha's title, and frustrated his ability to finance the work on his property – all for the purpose of trying to force Chadha to acquiesce and to sell to NPES at a substantially reduced price." (Exh. 1, p.32).

96. The Underlying Action alleges that "NPES (through its Board) was at all times fully and meaningfully aware of all of Lynn [Lawrence's] tactics and the involvement and improper persuasion of the city of Chicago." (Exh. 1, p.32).

97. The Underlying Action alleges that all Defendants were aware of their roles in helping NPES and Lawrence obtain the Property "through any means possible" and "knowingly and substantially assisted in the principal violations…" (Exh. 1, p.32-33).

98. NPES, Lawrence, and Moulton allegedly engaged in these actions beginning in the Spring of 2010. (Exh. 1, p.6-7).

99. The E&O Endorsement of the Package Policy and E&O Endorsement of the Umbrella Policies each exclude coverage for any claim "arising out of…Malicious prosecution"

and "Oral or written publication or material that slanders or libels a person or organization or disparages a person's or organizations' goods, products or services…"

100.    The CGL and UL Coverage Forms of the Package and Umbrella Policies have exclusions for personal and advertising injury: "caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict 'personal and advertising injury'"; or "arising out of oral or written publication…if done by or at the direction of the insured with knowledge of its falsity"; or "whose first publication took place before the beginning of the policy period."

101.    Accordingly, the foregoing provisions apply and the Insurers have no duty to defend the Underlying Action.

WHEREFORE, the Insurers pray that this Honorable Court find and declare the rights and duties of the parties, and specifically find and declare:

      a.  That the Insurers owe no duty to defend NPES, Lawrence, Moulton or Bowdon in relation to the Underlying Action;

      b.  That the Insurers owe no duty to indemnify NPES, Lawrence, Moulton or Bowdon for any damages in relation to the Underlying Action; and

      c.  For such other relief as is just and necessary.

### COUNT II

102.    The Insurers re-allege paragraphs 1 through 101.

103.    The Underlying Action alleges that Defendants acted "in furtherance of their conspiratorial and fraudulent scheme," "committed fraud and through their tactics tricked the former owner of 2033 W. Montrose to see that property." (Exh. 1, p.23-24).

104.    The Underlying Action alleges that Defendants "defamed Chadha and used fraudulent misrepresentations" and knowingly and "intentionally interfered" with Chadha's

expectancy of rehabbing the Property by "taking steps and seeking out aldermanic and political assistance" and "putting pressure" on Chadha. (Exh. 1, p.28).

105.    The Underlying Action alleges that Defendants encouraged wrongful and unsustainable claims against Chadha, performed wrongful acts of conspiracy, and "knowingly and intentionally performed wrongful acts which damaged Chadha." (Exh. 1, pp.30).).

106.    The Underlying Action alleges that NPES "wrongfully and without just cause, claimed he poisoned children or had connection to lead exposure…when that was not true…all for the purpose of trying to force Chadha to acquiesce and to sell to NPES at a substantially reduced price." (Exh. 1, p.32).

107.    The Underlying Action alleges that "NPES (through its Board) was at all times fully and meaningfully aware of all of Lynn [Lawrence's] tactics and the involvement and improper persuasion of the city of Chicago." (Exh. 1, p.32).

108.    The E&O Endorsement of the Package Policy and E&O Endorsement of the Umbrella Policies exclude coverage for any insured "who commits, participates in or consents to a 'wrongful act' that is criminal, fraudulent, malicious or deliberately dishonest."

109.    The CGL and UL Coverage Forms of the Package and Umbrella Policies excludes coverage for expected or intended injury, or "bodily injury" or "property damage" expected or intended from the standpoint of the insured.

110.    Thereby, the foregoing provisions apply and the Insurers have no duty to defend or indemnify the Underlying Action

WHEREFORE, the Insurers pray that this Honorable Court find and declare the rights and duties of the parties, and specifically find and declare:

    a. That the Insurers owe no duty to defend NPES, Lawrence, Moulton or Bowdon in relation to the Underlying Action;

    b. That the Insurers owe no duty to indemnify NPES, Lawrence, Moulton or Bowdon for any damages in relation to the Underlying Action; and

    c. For such other relief as is just and necessary.

**COUNT III**

111. The Insurers re-allege paragraphs 1 through 110.

112. The Underlying Action alleges that NPES "defamed Chadha and used fraudulent misrepresentations" to rally the Alderman's Office and "acted in furtherance of a conspiracy in that they communicated and banded together for the purpose of accomplishing by concerted action, the harassment and slander and intimidation of Chadha as well as by making and asking others to make the false complaints." (Exh. 1, p.25).

113. The Underlying Action alleges that Chadha has "suffered prejudice in the neighborhood," been harassed by Moulton, Lawrence and NPES supporters and has suffered from defamatory statements and suggestions about Chadha's hurting of children and exposing NPES students to lead as a result of Defendant's false claims. (Exh. 1, p.29).

114. The Underlying Action alleges that Chadha has been "severely damaged by the acts and omissions of the Defendants" and that his "business as a real estate professional has been impacted due to the false statements made in the neighborhood, community, and through the real estate profession." (Exh. 1, p.28-29).

115. The allegations do not seek recovery for "property damage" or "bodily injury" caused by an "occurrence" during the Policy Period as those terms are defined in the Package and Umbrella Policies.

116.    The injury claimed was not caused by an "accident" or an "occurrence" within the meaning of the Package and Umbrella Policies.

117.    The injury claimed does not qualify as "property damage" within the meaning of the Package and Umbrella Policies.

118.    The injury claimed in the Complaint does not qualify as "bodily injury" within the meaning of the Package and Umbrella Policies.

119.    Thereby, the Insurers have no duty to defend the Underlying Action.

WHEREFORE, the Insurers pray that this Honorable Court find and declare the rights and duties of the parties, and specifically find and declare:

    a.    That the Insurers owe no duty to defend NPES, Lawrence, Moulton or Bowdon in relation to the Underlying Action;

    b.    That the Insurers owe no duty to indemnify NPES, Lawrence, Moulton or Bowdon for any damages in relation to the Underlying Action; and

    c.    For such other relief as is just and necessary.

## COUNT IV

120.    The Insurers re-allege paragraphs 1 through 119.

121.    The Complaint alleges that Defendants knowingly began their concerted efforts and schemes to frustrate Chadha's ability to rehab and/or sell the Property at a market price in approximately March 2010.

122.    The Complaint alleges that Defendants persisted in such efforts and schemes through at least the spring of 2011.

123.    As alleged in the Complaint, Defendants were aware prior to the inception of the Policies on September 1, 2011 of the alleged acts, errors, omissions, occurrence, and injuries

and/or damages at issue alleged in the Complaints and as defined by the E&O Endorsements of the Package and Umbrella Policies.

124.     As alleged in the Complaint, Defendants were aware prior to the inception of the Policies that they could be subject to a lawsuit, claim or other action in relation to their attempts to purchase the Property and communications and representations related to the Property.

125.     Under their respective Policies, the Insurers have no obligation to defend or indemnify the Defendants as they were aware prior to the inception of the Policies of the alleged acts, errors, omissions, occurrence, and injuries and/or damages at issue and alleged in the Complaint.

126.     Under their respective Policies, the Insurers have no obligation to defend or indemnify the Defendants as they were aware prior to the inception of the Policies that they could be subject to a lawsuit or other action in relation to their attempts to purchase the Property and communications and representations related to the Property.

127.     NPES first provided notice of any "wrongful act" which may result in a "claim" pursuant to the Policies on August 27, 2012.

128.     As set forth above, the E&O Endorsement of the Package Policy and E&O Follow Form Endorsement of the Umbrella Policy require an insured to give notice "as soon as practicable of any 'wrongful act' which may result in a 'claim.'"

129.     NPES failed to provide such practicable notice, since more than two years elapsed before it gave notice of any of the "wrongful acts" pursuant to the Policies at issue.

130.     Therefore, NPES has failed to comply with this condition of coverage and the Insurers have no duty to defend the Underlying Action.

WHEREFORE, the Insurers pray that this Honorable Court find and declare the rights and duties of the parties, and specifically find and declare:

      a.   That the Insurers owe no duty to defend NPES, Lawrence, Moulton or Bowdon in relation to the Underlying Action;

      b.   That the Insurers owe no duty to indemnify NPES, Lawrence, Moulton or Bowdon for any damages in relation to the Underlying Action; and

      c.   For such other relief as is just and necessary.

## COUNT V

131. The Insurers re-allege paragraphs 1 through 130.

132. The Insurers do not have duty to defend or indemnify because coverage is be barred, in whole or in part, by the other provisions, terms, conditions, limitations and exclusions contained in the Policies, including without limitation, conditions precedent, per occurrence and aggregate limits, deductibles or other limits of liability, self-insured retentions, policy periods, exhaustion of other insurance and exclusions.

133. Further, Consolidated agreed to defend under a reservation of rights and to participate in the defense with other insurers by paying its share of the defense pursuant to the terms of the Policies. (Exh. 7, 12).

134. Consolidated reserved all rights to deny coverage and to seek reimbursement of defense costs pursuant to the Package Policy. (Exh. 15-16).

135. The Insurers have no duty to defend or indemnify NPES, Lawrence, or Moulton, or Bowdon for the Underlying Action.

136. In the event this Court determines that the Insurers owe no duty to defend, Consolidated is entitled to reimbursement of all such defense costs.

WHEREFORE the Insurers pray that this Court enter judgment in their favor and against Defendants and enter an Order finding and declaring the rights of the parties as follows:

    a.    Consolidated has no duty to defend or indemnify the Underlying Action

    b.    Consolidated is entitled to reimbursement of all defense costs paid in the Underlying Action if it is determined there is no defense obligation; and

    c.    Any further relief that this Court deems proper and just under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38, Federal Rules of Civil Procedure, the Insurers hereby demand a trial by jury for all issues so triable.


Dated:        May 25, 2017

                Respectfully Submitted,

                GORDON & REES SCULLY MANSUKHANI, LLP

                By: /s/Alex B. Mahler
                Alex B. Mahler (#6273483)
                Regina A. Ripley (#6275774)
                Ji Suh (#6304099)
                1 North Franklin, Ste. 800
                Chicago, IL 60606
                amahler@grsm.com
                rripley@grsm.com
                jsuh@grsm.com
                Ph: (312) 980-6782
                **Attorneys for Consolidated Insurance Company and Indiana Insurance Company**